UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| Medic Drug, Inc., on behalf of itself and all others similarly situated,<br><br>      Plaintiff,<br><br>vs.<br><br>THE PURDUE PHARMA COMPANY, PURDUE PHARMA L.P., THE PURDUE FREDERICK COMPANY, PURDUE PHARMACEUTICALS, L.P., and P.F. LABORATORIES INC.,<br><br>      Defendants. | Case No. _____<br><br>CLASS ACTION COMPLAINT<br><br><br><br>JURY TRIAL DEMANDED<br><br><br><br>MARCH 3, 2004 |

**CLASS ACTION COMPLAINT**

Plaintiff Medic Drug, Inc. ("Medic Drug" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against Defendants The Purdue Pharma Company, Purdue Pharma L.P., The Purdue Frederick Company, Purdue Pharmaceuticals, L.P., and P.F. Laboratories, Inc. (collectively "Defendants" or "Purdue"), and upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, states as follows:

**NATURE OF CLAIM**

1.  This action arises from Defendants' unlawful creation and maintenance of a monopoly over the brand-name drug OxyContin, an opioid analgesic containing a controlled-release formulation of the active ingredient oxycodone hydrochloride. To obtain patents for OxyContin,

Defendants knowingly made false and misleading material statements to the United States Patent and Trade Mark Office ("PTO"). As a result of their fraudulent misrepresentations, Defendants obtained four U.S. patents relating to OxyContin: 5,266,331 (the "331 patent"); 5,549,912 (the "912 patent"); 5,508,042 (the "042 patent"); and 5,656,295 (the "295 patent") (collectively, the "Patents").

2. Defendants' Patents allowed them to create and maintain a monopoly over the sale of OxyContin, and to eliminate potential competition from the sale of generic versions of OxyContin. Defendants further perpetuated their unlawful monopoly by causing the U.S. Food and Drug Administration ("FDA") to list their OxyContin Patents in the Orange Book, thus protecting Purdue's monopoly, and by instituting baseless patent infringement actions against proposed manufacturers of generic equivalents. If Purdue had not engaged in fraudulent and improper conduct, a cheaper generic version of OxyContin would have been available sooner.

3. Plaintiff and members of the Class have been harmed by Defendants' unlawful and anticompetitive conduct by being forced to pay inflated prices for OxyContin, and by being deprived of the ability to purchase cheaper generic versions of the drug. Plaintiff, on behalf of itself and the Class described below, brings this action under federal antitrust laws, for damages and other declaratory and injunctive relief.

## JURISDICTION AND VENUE

4. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1332, and 1337(a), and 15 U.S.C. §§ 15, 22, and 26.

5. Venue as to Defendants is proper in the District of Connecticut, pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b) and (c), because Defendants are found and transact business in the District of Connecticut and/or the claims arose at least in part in the District of Connecticut. Defendants regularly and continuously conduct business in interstate and foreign

commerce between and among the several United States and foreign countries. The interstate trade and commerce described herein has been carried out, in part, within the District of Connecticut.

## THE PARTIES

**Plaintiff**

6.   Plaintiff Medic Drug is a corporation organized and existing under the laws of the state of Ohio and has its principal place of business in Cleveland, Ohio. Medic Drug operates a chain of thirty drug stores. Plaintiff purchased OxyContin manufactured and/or distributed by Defendants, and paid inflated prices because of Defendants' unlawfully obtained and perpetuated monopoly during the Class Period (defined herein). Plaintiff also has been deprived of the opportunity to purchase cheaper, generic versions of OxyContin. Plaintiff thus has been damaged as a result of Defendants' unlawful conduct.

7.   Plaintiff Medic Drug files its claims of a direct purchaser against the Defendants pursuant to the laws of the United States of America.

**Defendants**

8.   Defendant, The P.F. Laboratories, Inc., is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 700 Union Boulevard, Totowa, New Jersey, and is engaged in the manufacture of pharmaceutical products.

9.   Defendant, Purdue Pharma L.P., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut, and is engaged in the development, manufacture, and marketing of pharmaceutical products.

10.   Defendant, The Purdue Pharma Company, is a general partnership organized and existing under the laws of the state of Delaware with its principal place of business at One Stamford

Forum, 201 Tresser Boulevard, Stamford, Connecticut, and is engaged in the development, manufacture, and marketing of pharmaceutical products.

11. Defendant, The Purdue Frederick Company, is a corporation organized and existing under the laws of the state of New York with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut, and is engaged in the development, manufacture, and marketing of pharmaceutical products.

12. Defendant, Purdue Pharmaceuticals L.P., is a corporation organized and existing under the laws of the state of Delaware. Its principal place of business is located at 4701 Purdue Drive, Wilson, North Carolina, and it is engaged in the development, manufacture, and marketing of pharmaceutical products.

## CLASS ACTION ALLEGATIONS

13. Plaintiff brings this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. The class is defined as:

> All individuals or entities who purchased OxyContin directly from Defendants during the period August 27, 1996 to the present (the "Class Period"). Excluded from the Class are all governmental entities, the Defendants, and any subsidiaries or affiliates of the Defendants, whether or not named as a defendant in this Complaint.

14. The Class is so numerous that joinder of all members is impracticable. Due to the sheer volume of Defendants' OxyContin sales, Plaintiff believes that the members of the class are geographically dispersed throughout the United States, and that joinder of all class members would be impracticable. While the exact number of the members of the Class is unknown to Plaintiff at this time, Plaintiff believes that there are at least in excess of one hundred members of the Class.

15. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, including Defendants' efforts to mislead the PTO

in obtaining its patents for OxyContin, and Defendants' subsequent efforts to obtain and perpetuate its monopoly over OxyContin manufacturing and marketing.

16. Plaintiff's claims are typical of the claims of the other members of the Class, in that Plaintiff purchased and/or paid for OxyContin during the Class Period, and that Plaintiff and all members of the Class were damaged by the same unlawful and anticompetitive conduct of Defendants.

17. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff has no interest in this litigation that is adverse to or in conflict with the interests of the other members of the Class.

18. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants' Patents are unenforceable due to Defendants' material misrepresentations to the PTO;

(b) Whether Defendants engaged in unfounded litigation for the purposes of preventing competition;

(c) Whether Defendants have monopolized and attempted to monopolize the market for OxyContin and generic versions of OxyContin;

(d) Whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages;

(e) The appropriate measure of damages incurred by the Class; and

    (f)  Whether the Class is entitled to injunctive relief.

  19.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and the Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

  20.  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## INTERSTATE TRADE AND COMMERCE

  21.  During all or part of the relevant time period, Defendants manufactured and sold substantial amounts of OxyContin in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.  Defendants' annual sales of OxyContin approach $1.8 billion annually.

  22.  During all or part of the relevant time period, Defendants transmitted funds as well as contracts, bills, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of OxyContin.

23. Upon Plaintiff's information and belief, during all or part of the relevant time period, all Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate travel, in furtherance of their anticompetitive and illegal conduct as alleged herein.

24. The anticompetitive and illegal conduct alleged herein has restrained trade and substantially affected interstate and foreign commerce.

**FACTUAL ALLEGATIONS AND BACKGROUND**

25. In or about December of 1995, the FDA approved OxyContin. Since in or about 1996, Defendants and their affiliates have exclusively manufactured and marketed OxyContin.

26. In the late 1980s, Purdue began developing a controlled-release formulation of a pain-relieving drug with oxycodone. Previously, a Purdue affiliate had developed and patented a controlled-release pain-relieving drug with morphine. In addition to carrying a stigma, morphine has the disadvantage of requiring significant variation in the dosage levels required to control pain. Thus, the process of finding the right dosage to control a particular patient's pain ("titration") can be lengthy.

27. Purdue began filing patent applications for oxycodone beginning in 1991. In these applications, and in subsequent exchanges with the PTO, Purdue represented that it had "surprisingly discovered" that its controlled-release oxycodone formulation would control pain for "approximately 90% of patients" over a comparatively narrow, four-fold dosage range, thus simplifying and speeding up the titration process. Purdue claimed "[t]he expertise and time of physicians and nurses, as well as the duration of unacceptable pain patients must endure during the opioid analgesic titration process is substantially reduced[.]"

28. The patent examiner relied upon Purdue's alleged "discovery" regarding the reduced dosage ranges in approving Purdue's patent applications.

29.     Despite using "precise, quantified, past-tense language" to support its "discovery," Purdue *did not have any scientific proof* for its key contentions concerning its controlled release oxycodone formulation. Instead, Purdue *intentionally withheld this material fact from the PTO*.

30.     Purdue made other intentional and material misrepresentations and omissions to the PTO, resulting in the issuance of the Patents on or about November 30, 1993 (the 331 patent), April, 16, 1996 (the 042 patent), August 27, 1996 (the 912 patent), and August 12, 1997 (the 295 patent).

31.     Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, FDA approval is required before a company may market or sell a pharmaceutical product in the United States. Approval for a new or brand name drug is sought by filing a New Drug Application ("NDA") with the FDA.

32.     Under the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act"), a generic pharmaceutical manufacturer seeking FDA approval to market a drug no longer needs to complete a full NDA. Instead, under 21 U.S.C. § 355(j), a generic company may file an Abbreviated New Drug Application ("ANDA"), which relies on the FDA's previous findings of safety and efficacy. The applicant must include in the ANDA a certification that the proposed generic drug would not infringe existing valid patents for one of several enumerated reasons. 21 U.S.C. §355(j)(2)(A)(vii). If the generic applicant claims that a relevant patent is invalid or will not be infringed by its product, it must so certify to the FDA, and notify the patentholder. 21 U.S.C. §355(j)(2)(A)(vii)(IV) (commonly known as a "Paragraph IV Certification"); 21 U.S.C. §355(j)(2)(B)(i). If a patent infringement suit is filed against the ANDA filer within the 45-day period, however, FDA approval of the ANDA is automatically stayed until the earliest of: (i) patent expiration; (ii) a final judicial determination of non-infringement or invalidity in the lawsuit; or

(iii) the expiration of a 30-month period from the time the patentholder receives a Paragraph IV Certification.

33. Defendants have attempted to perpetuate their monopoly over the manufacture and marketing of OxyContin by initiating a patent infringement action against a prospective manufacturer of generic OxyContin equivalents, thus automatically halting approval of the generic drug ANDAs. However, as described below, Defendants' patents were unlawfully obtained through misrepresentations Defendants made to the PTO, and were thus invalid and unenforceable.

34. Defendants initiated and maintained their baseless infringement suit to preserve their monopoly even though Defendants were aware that their patents were invalid and unenforceable.

**The Endo Action and Defendants' Misrepresentations**

35. In July 2000, February 2001, and July 2001, generic drug manufacturer Endo Pharmaceutical Holdings ("Endo") filed applications with the FDA to market generic versions of OxyContin in 10mg, 20mg, 40mg, and 80mg strengths.

36. In an attempt to block FDA approval of Endo's generic version of OxyContin, Defendants initiated a patent infringement action in the United States District Court for the Southern District of New York, *Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*, Nos. 00-civ-8029, 01-cv-2109, 01-cv-8177 (S.D.N.Y.) ("the *Endo* Action"). Defendants alleged that the generic version of OxyContin proposed by Endo would infringe on its patents for oxycodone hydrochloride, Patent No. 5,549,912, Patent No. 5,508,042, and Patent No. 5,656,295.

37. On January 5, 2004, Judge Sidney Stein held that Defendants' Patents are invalid and unenforceable due to material misrepresentations made by Defendants to the PTO. *See Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.,* Nos. 00-civ-8029, 01-cv-2109, 01-cv-8177, 2004 U.S. Dist. LEXIS 10, at *88 (S.D.N.Y. Jan. 5, 2004).

38. Judge Stein found that in order to win their Patents, Defendants informed the PTO that their oxycodone formulation provided relief in 90% of patients at substantially lower dosages than opioid analgesics in general. Defendants also repeatedly asserted to the PTO that their oxycodone formulation provided pain relief for most patients over a four-fold dosage range, leading to easier titration. *See id.* at *68-*70.

39. At trial, however, OxyContin's inventor, Dr. Robert F. Kaiko, admitted that he had "no scientific proof" that Defendants' oxycodone formulation exhibited the claimed reduced dosage rate. *Id.* at *70. Additionally, Dr. Kaiko testified that at no time did there exist at Purdue "'a set of procedures and methods' that could 'provide definitive conclusions' that OxyContin was 'the most easily titratable strong analgesic,' and that such a test would require 'hundreds of thousands of patients.'" *Id.* at *79.

40. Dr. Paul D. Goldenheim, Purdue's executive vice president and chief scientific officer, testified that as of October 1993, Defendants "weren't anywhere close" to proving that OxyContin was "the most efficiently titratable long-acting strong analgesic," and that such claims were "clearly Bob Kaiko's vision." *Id.* at *79.

41. Judge Stein found that Defendants' failure to inform the PTO of their lack of scientific evidence was misleading and misrepresentative:

> Purdue repeatedly and convincingly stated to the PTO that it had discovered an oxycodone formulation that did not simply control pain over a reduced dosage range, but controlled pain over a "four-fold" range of doses for "approximately 90%" of patients. Purdue asserted to the PTO that this "result" was of "extreme clinical importance." DX 2033, P 000177 ("The above result [that the oxycodone formulations claimed can be used over approximately 1/2 the dosage range as morphine] is surprising and of extreme clinical importance"); DX 2008, EN205621 ("One skilled in the art would certainly not arrive at this surprising result without the benefit of hindsight."). Such definitive statements to the PTO would clearly be undercut if the PTO were aware that the statements lacked any support other than Dr. Kaiko's assertions and "insight."

*Id.* at *74-*75 (footnote omitted).  Due to Defendants' misrepresentations to the PTO, Judge Stein ruled Defendants' patents unenforceable:

> [Purdue's] patents are invalid due to Purdue's inequitable conduct before the PTO during the prosecution of the patents in suit.  The patent claims against Endo are dismissed, patents 5,549,912, 5,508,042 and 5,656,295 are declared invalid and Purdue is enjoined from enforcing those patents.

*Id.* at *88.

42.     If Purdue had not knowingly and intentionally made misrepresentations and omissions of highly material information to the PTO, the PTO would not have issued the Patents.  If Purdue had not obtained the Patents, it would not have been able to list them in the Orange Book, sue potential generic competitors for patent infringement, or invoke the 30-month stay of Hatch-Waxman.

43.     But for Purdue's wrongful conduct, Endo would have obtained final approval and begun marketing its own controlled-release oxycodone products on July 31, 2002, or even earlier.  Endo's product would have been priced below Purdue's OxyContin product, permitting plaintiff and other direct purchasers of OxyContin to save money by substituting Endo's cheaper generic and/or by obtaining increased discounts or lower prices on purchases of OxyContin as a result of price competition from a generic.

44.     Defendants' anticompetitive conduct is not entitled to immunity under the Noerr-Pennington doctrine because: (a) the FDA's conduct in listing the Patents was a purely ministerial act, and thus Defendants' conduct before the FDA does not constitute legally protected petitioning activity; (b) the Noerr-Pennington doctrine does not immunize or protect the act of deceiving the FDA; and (c) the patent litigation actions brought by Purdue were "shams," which no litigant could reasonably have expected to win, and which were prosecuted for the purpose of delaying generic competition for OxyContin.

**FRAUDULENT CONCEALMENT**

45. Due to Defendants' misrepresentations, Defendants were able to fraudulently conceal the true nature of their invalid and unenforceable Patents. Because of such fraudulent concealment, Plaintiff and the Class could not have discovered Defendants' wrongful conduct any earlier than its public disclosure.

**MONOPOLY POWER**

46. Defendants have monopoly power over OxyContin, oxycodone hydrochloride c-r and all generic equivalents. The relevant product market is the manufacture and sale of OxyContin, oxycodone hydrochloride c-r, and all generic equivalents.

47. The relevant geographic market for purposes of this action is the United States and its territories.

48. At all times relevant to this Complaint, Defendants' share in the relevant product and geographic markets has been 100%.

**COUNT I**
**MONOPOLIZATION OF MARKET FOR THE DISTRIBUTION AND SALE OF OXYCONTIN IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**

49. Plaintiff incorporates by reference the preceding allegations.

50. Defendants engaged in conduct designed to unlawfully create and perpetuate their monopoly over the manufacture and marketing of OxyContin, oxycodone hydrochloride c-r and all generic equivalents in the United States in violation of Section 2 of the Sherman Act. Specifically, Defendants:

    (a) intentionally submitted false patent information to the FDA;

    (b) intentionally made false statements and misrepresentations to the PTO;

    (c) induced the FDA to list the Patents in the Orange Book through submission of false patent information to the FDA;

(d) initiated and maintained baseless patent infringement actions against potential manufacturers of generic versions of OxyContin;

(e) intentionally asserted claims and defenses against competitors based on Defendants' wrongfully acquired and invalid patents.

51. Defendants' conduct has had the following effects on the relevant market:

(a) The purchase price for OxyContin has been and remains artificially inflated due to the lack of competition arising from Defendants' conduct;

(b) Potential generic versions of OxyContin have been and are being prevented from gaining FDA approval;

(c) Defendants' potential competitors are dissuaded from developing and submitting for approval generic versions of OxyContin;

(d) Purchasers are forced to pay artificially high prices for OxyContin;

(e) Purchasers are foreclosed from seeking cheaper, generic versions of OxyContin.

52. By reason of the violations of Section 2 of the Sherman Act, Plaintiff and the members of the Class have sustained injury to their business or property. Defendants have foreclosed the opportunity of Plaintiff and class members to purchase cheaper generic or other competing versions of the drug. As a result of Defendants' unlawful and anticompetitive conduct, Plaintiff and the Class sustained the injury of paying supracompetitive prices for OxyContin and related oxycodone hydrochloride c-r products. This is an "antitrust" injury of the type that the federal laws were meant to prevent.

53. Plaintiff seeks a declaration from the Court that Defendants' conduct in monopolizing and attempting to monopolize the relevant markets through their use of their invalid patents were

unlawful and violated Section 2 of the Sherman Act. Plaintiff further seeks treble damages, injunctive relief, attorneys' fees and costs pursuant to Section 4 of the Clayton Act and other applicable law to remedy the effects of Defendants' unlawful and anticompetitive conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for the following relief:

A. That this action may be maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, and declaring Plaintiff as a representative of the Class and its counsel as counsel for the Class; and

B. A declaration that Defendants have committed the violations alleged herein;

C. A judgment for the damages sustained by Plaintiff and the Class defined herein, and for any additional or multiple damages, penalties and other monetary relief provided by applicable law, including treble damages;

D. An injunction preventing Defendants from engaging in future anticompetitive practices concerning the marketing or manufacture of OxyContin, oxycodone hydrochloride c-r, and OxyContin equivalents;

E. The costs of this suit, including reasonable attorneys' fees; and

F. Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

DATED: March 3, 2004                    SCOTT + SCOTT, LLCF


/s/ _____

DAVID R. SCOTT (CT #16080)
ERIN GREEN COMITE (CT #24886)
108 Norwich Avenue,
P.O. Box 192
Colchester, Connecticut 06415
Telephone: 860-537-5537
860-537-4432 (fax)


SCOTT + SCOTT, LLC
EDMUND W. SEARBY (OH #0067455)
33 River Street
Chagrin Falls, Ohio 44022
Telephone: 440-247-8200
440-247-8275(fax)

MILBERG WEISS BERSHAD HYNES &
LERACH LLP
BONNY E. SWEENEY
CHRISTOPHER M. BURKE
HELEN I. ZELDES
401 B. Street, Suite 1700
San Diego, California 92101
Telephone: 619-231-1058
619-231-7423 (fax)

THE LANDSKRONER LAW FIRM, LTD.
JACK LANDSKRONER
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
216-522-9000
216-522-9007 (fax)

Attorneys for Plaintiff Medic Drug